OPINION OF THE COURT
Joan S. Kohout, J.
A petition was filed by the Monroe County Department of Social Services on June 18, 1999 alleging that Marilyn B. and Alfred B. had violated a previously imposed order of suspended judgment and that as a result their parental rights to their four sons should be terminated. Both parents appeared and were assigned counsel. The Law Guardian who had previously represented the children was reassigned and actively participated in the proceedings. Madelyn and Dennis E., foster parents for Derrick and Darren, intervened and also actively participated throughout the case.
Legal Background
This case was plagued from the start by many issues that resulted in the multiple lengthy adjournments. Motions requesting confidential records, the schedules of the five attorneys involved and a change of counsel for one respondent in midtrial all combined with the court’s heavy case load to cause what can only be described as horrendous delays in this case.[1]
Toward the end of the trial, the petition was withdrawn as to Marilyn B. based upon her execution of a condition surrender concerning Derrick and Darren. (See, Social Services Law § 383-c [5] [b] [ii], [iii].) Additionally, petitioner withdrew its requests to terminate respondents’ parental rights concerning the older boys Alfred, Jr., and Jacob because of their special needs and circumstances.[2]
Consequently, at the end of the trial concerning the remaining respondent, Alfred B., the issues were narrowed to whether *371 Mr. B. had violated the suspended judgment order such that his rights concerning Derrick and Darren should be terminated.
Findings of Fact
Alfred B. and his wife Marilyn B. are the parents of all four children originally the subjects of this petition. As previously explained, only Darren, born July 26, 1994, and Derrick, born June 8, 1993, continue on the petition. Both boys reside together in the foster home of Madelyn and Dennis E., who have intervened in this case.
On August 7, 1998 the Monroe County Department of Social Services filed a petition alleging that both parents had permanently neglected their four sons and requested termination of parental rights under Social Services Law § 384-b (7). On August 18, 1998 Mr. and Ms. B. appeared in Family Court and consented to a finding of permanent neglect with a stipulation that they would receive a suspended judgment for one year. (See, Family Ct Act § 633.) At the same time, they agreed to extend the children’s placements under a neglect order, also for one year. (Combined docket No. N-345/347-96M and N-536/ 541-94M.)
Under the suspended judgment order Mr. B. was required to:
(1) have supervised visitation
(2) attend mental health counseling
(3) “consistently follow through on recommendations made as a result of the aforesaid counseling and therapy, including but not limited to taking medications regularly which may be prescribed, and only as prescribed”
(4) engage in drug/alcohol treatment and submit to testing as requested
(5) participate in drug/alcohol support groups if recommended
(6) participate in Men’s Workshop domestic violence counseling
(7) participate in couples’ counseling if recommended by the treating agencies
(8) complete a parenting class
(9) maintain suitable housing and income
(10) comply with an order of protection directing, inter alia, that he abstain from use of drugs and be free from the influence of drugs or alcohol while in the presence of the children.
*372 The testimony unequivocally proved that Mr. B. complied with the order in many respects. Mr. B. has been diagnosed with both mental health and substance abuse issues and is limited because of his inability to read. In order to address these problems, Mr. B. attended mental health counseling at Averill Court, which is a MICA program focusing on both mental health and substance abuse issues. Mr. B. also attended visitation and completed the Mt. Hope Family Center parenting classes. In addition, he completed recommended inpatient substance treatment at St. James Mercy Hospital (MATCH program) from the end of December 1998 through the end of January 1999. Finally, he participated in and ultimately completed the Men’s Workshop as required.[3]
There was no proof that any of the treatment providers ever recommended that Mr. B. participate in support groups or couples’ counseling as mentioned in the court order. As a result, there were no violations proven in this regard.
Additionally, while petitioner proved that there were several occasions during the period of the order when Mr. B. used drugs, these lapses in and of themselves did not amount to a violation of the order since there was no proof that he was high or used drugs during his periods of supervised visitation with the children. Significantly, there was no proof that Mr. B.’s relapses were contrary to the recommendations or program requirements imposed by his treatment providers. Indeed, after the first relapse occurred in December 1998, Mr. B. attended inpatient treatment as recommended by his therapists.
The primary areas of dispute in this case concern whether Mr. B. compiled with treatment recommendations regarding residence in a halfway house and whether he violated the court-ordered requirement that he maintain suitable housing.
Upon his discharge from St. James Mercy Hospital in late January 1999, a halfway house and aftercare were recommended for Mr. B. As a result, Mr. B.’s therapists at Averill Court referred him to East House, a halfway house. Mr. B. was not accepted into East House primarily because of a difference of opinion as to how much of his SSI grant should be taken by the agency to cover his care. Although Mr. B. told the *373 East House worker, Vicky Cook, that he would cooperate with a halfway house program, he repeatedly told DSS caseworker, Marianne C., that he did not want to go to a halfway house. Mr. B. testified that he did not want to go to a halfway house because he would not be able to follow the restricted diet he requires because he has “ulcerated colitis.” There was no proof presented, however, that the halfway house would be unable to accommodate Mr. B.’s dietary needs. Apparently, as a result of his lack of interest in halfway houses, no other referrals for such programs were made. It is undisputed that Mr. B. never entered the halfway house.
After Mr. B. returned to Rochester from St. James Mercy in January 1999 he lived in various places, including an apartment rented with his wife at 61 Arch Street. Mr. B. explained his dissatisfaction with the apartment, describing it as rodent- and roach-infested and periodically lacking heat. This apartment had been located with assistance from Shelter Plus worker Lisa Dallas. Ms. Dallas assisted Mr. B. from November 1998 through March 1999. Ms. Dallas presented during her testimony as a worker genuinely committed to assisting her clients, even going beyond her specific charge of focusing only on housing issues.
Regrettably, Mr. B. was terminated in March 1999 from Shelter Plus for two positive drug screens. Mr. B. disputed those screens and the reports were never entered into evidence;[4] however, the practical result was that Mr. B. became ineligible for the housing assistance he needed.
During this same period, beginning in late January 1999, Mr. and Ms. B. began having serious disputes. Mr. B. accused his wife of stealing his SSI check and using it for drugs and reported to the caseworker that he feared that Ms. B.’s continued drug use would cause them to lose the children. Ms. B. complained that Mr. B. had physically abused her and reported that she had obtained an order of protection. For a brief time Mr. B. was in jail as a result of Ms. B.’s complaints and Ms. B. went to the Alternatives for Battered Women Shelter. Later, they told the workers that they wanted to find a better apartment where they could live together.
*374 It seems that this was a turbulent period for the marriage with periods of reconciliation punctuated by periods of discord. Worker Marianne C. testified that as of the end of May 1999 she was not sure whether Mr. and Ms. B. were still a couple.
Mr. B. did not have a permanent residence between February 1999 through the filing date of the petition on June 18, 1999. It seems that Ms. B. was able to locate her own apartment and she signed a lease for an apartment on Ridgeway Avenue on March 23, 1999. Mr. B. continued, however, to stay with a variety of friends and family members. He generally kept Ms. C. aware of his location and how to reach him. There is no indication that any of his temporary residences would have been adequate for his children. Nor was there any explanation offered by Mr. B. as to why he failed to obtain a new apartment after he and his wife separated.
Conclusions of Law
Family Court Act § 633 permits the issuance of a suspended judgment order as a disposition in a permanent neglect case. The suspended judgment provides a final opportunity for a parent with children in foster care to remedy their problems. If the parent complies with the requirements of the order, then no termination of parental rights occurs. (See, Carrieri, 2000 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 52A, Social Services Law § 384-b, 2001 Supp Pamph, at 318.)
The statute, however, does not provide a procedure to address violations of the order. The only procedure is contained in Uniform Rules for Family Court (22 NYCRR) § 205.50 (d), which states that when a respondent “fails to comply” with the terms of a suspended judgment order, a petition seeking revocation of the order may be filed. The court rule further directs that:
“if, after a hearing, the court is satisfied that the allegations of the petition have been established, the court may modify, revise or revoke the order of suspended judgment.” (22 NYCRR 205.50 [d] [4].)
Since a hearing on a petition seeking revocation of suspended judgment is considered dispositional in nature, it need only be proved by a preponderance of the evidence. (Matter of Gerald M., 112 AD2d 6 [4th Dept 1985]; Matter of Desiree W., 232 AD2d 227 [1st Dept 1996].)
While Mr. B. overcame a considerable number of obstacles during the period of the court order and accomplished many of the court-directed requirements, he failed in two significant *375 ways to complete the plan that was aimed at restoring his children to his care. He failed to maintain adequate housing and failed to cooperate with the treatment recommendation that he enter a halfway house.
During the majority of the period covered by the court order, Mr. B. failed to provide stable housing that would provide a safe and adequate home for his sons. (See, Matter of Grace Q., 200 AD2d 894 [3d Dept 1994].) Mr. B. provided no explanation for his failure to obtain housing. It is noteworthy that after the parents separated, Ms. B. was able to find her own apartment.
By the end of January 1999 it was recommended by St. James Mercy Hospital that Mr. B. enter a halfway house to support his recovery. This recommendation was adopted by Mr. B.’s mental health/substance abuse counselors at Averill Court, who made a referral to East House. After Mr. B. was rejected from East House, he stated that he would not go to a halfway house. There is no indication that Mr. B. made any efforts to follow up on this recommendation and, consequently, violated the provision of the suspended judgment requiring him to “consistently follow through on recommendations made as a result of the aforesaid counseling and therapy.”
While Mr. B. has made some progress, it is insufficient when considered in light of his failings. (See, Matter of Lord-El T., 260 AD2d 955, 956 [3d Dept 1999]; cf Matter of Nicole Lee B., 256 AD2d 1103 [4th Dept 1998].) As a result, the court finds that petitioner has sustained the petition by a preponderance of the evidence. Based upon the circumstances here, the court finds no need for an additional dispositional hearing to determine the children’s best interest and grants the request of petitioner to terminate the respondent’s parental rights concerning Derrick and Darren. (Cf. Matter of Desiree W., 232 AD2d 227, 228 [1st Dept 1996], supra.)
Based upon the foregoing, the court commits the guardianship and custody of the children Derrick and Darren to the Director of the Monroe County Department of Social Services for the purpose of adoption.

. Three of the five attorneys on the case served as assigned counsel either as Law Guardian or respondents’ attorneys. This case is but another example of the woefully inadequate supply of attorneys in serious Family Court cases, which is the result in large part of the inadequate pay for these dedicated lawyers. The few attorneys willing to accept difficult cases are often scheduled for trial in multiple court parts, resulting in delays in important cases concerning children. Similarly, attorneys representing the Monroe County Department of Social Services have enormous case loads, as do attorneys working in Family Court for the Monroe County Public Defender’s Office.

. Alfred, Jr., is presently 13 years old and is in residential placement at Hillside Children’s Center. Jacob is 12 and is also in specialized residential care. The petition was withdrawn concerning these children with the consent of their Law Guardian.

. Petitioner emphasized that Mr. B. did not complete the Men’s program during the period of the order. Mr. B. explained that he had to restart Men’s after he returned from inpatient care. The testimony from caseworker Marianne C. was that as of the filing date Mr. B. was attending the program. Therefore, he was in compliance since he was not required by the order to complete the program, but only to participate in it.

. Based upon the proof presented, the court is unable to determine whether there actually were positive drug screens as a result of Mr. B/s misuse of drugs. However, the insufficiency of the proof in this regard does not impact on this decision since there was no absolute prohibition from the use of illegal drugs and positive screens would, therefore, not in and of themselves constitute violations of the court order.